IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:14-CV-17-BR

| | | |
|---|---|---|
| JOHN T. MARTIN, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| BIMBO FOODS BAKERIES | ) | |
| DISTRIBUTION, INC. formally known as | ) | |
| GEORGE WESTON BAKERIES | ) | |
| DISTRIBUTIONS, INC., | ) | |
|     Defendant. | ) | |
| | ) | |

This matter is before the court on plaintiff's motions for a preliminary injunction and a hearing and defendant's ("defendant" or "BFBD") motions to strike affidavits and for leave to file a corrected declaration. (DE ## 9, 18, 27, 30.) The motions have been fully briefed and are ripe for disposition.

## I. BACKGROUND

In 2006, for a total of $108,000, plaintiff, as an "independent operator," purchased exclusive rights to sell and distribute bakery goods manufactured and/or distributed by defendant to grocery store chains and independent grocers in specified territorial areas. (Compl., DE # 1-1, ¶¶ 6, 8; Pl. Aff., DE # 12, at 1; Vickers Decl., DE # 30-1, ¶ 6.) Around the same time, plaintiff entered into a Distribution Agreement with defendant. (Compl., Ex. 1, DE # 1-1; Pl. Aff., DE # 12, at 1.) The Distribution Agreement further defines plaintiff's distribution rights and the parties' mutual obligations. (See generally Compl., Ex. 1, DE # 1-1.) Plaintiff is "paid on a percentage of sales or a margin on the sale of product." (Compl., DE # 1-1, ¶ 8.) According to plaintiff, he has created equity in his distribution route, and it is currently worth in excess of $140,000. (Id. ¶ 9.)

In June 2013, defendant informed plaintiff and other local independent operators that it was reducing the margins to be paid to them. (Id. ¶ 10.) Plaintiff and most of the other independent operators "united in an effort to fight the Defendant's effort to unilaterally reduce margins." (Id. ¶ 12.) A committee of six independent operators was formed to communicate and negotiate with defendant about the reduced margins. (Id.) Plaintiff was one of the committee members and took an active role in the committee, being "outspoken with regard to the sentiment of the 30 independent operators relative to the payment of commissions and/or reduction of margins received for services." (Id. ¶¶ 12, 18.) Various forms of communication between the committee, its counsel, representatives of defendant, and defense counsel occurred. (See id. ¶¶ 14-16.) According to plaintiff, defendant refused to negotiate. (Id. ¶ 15.)

In the meantime, plaintiff continued to operate his distribution route. (Id. ¶ 20.) On 21 December 2013, Brant Vickers, defendant's sales representative, called plaintiff into defendant's Raleigh office and delivered to him a document entitled "Notice of Termination of Distribution Agreement." (Id. ¶ 24 & Ex. 5.) In that document, defendant informed plaintiff that it recently discovered that plaintiff had "engaged in a practice of 'flushing' product by creating false sales and 'buyback' invoices," for which plaintiff received approximately $2,500 to which he was not entitled. (Id., Ex. 5.) According to the document, such conduct constitutes a "material and non-curable breach" of the Distribution Agreement. (Id.) The document also refers to other "material violations" of the Agreement, which constitute a "chronic breach" of the Agreement. (Id.) Defendant terminated the Distribution Agreement effective immediately. (Id.) Plaintiff requested a hearing with management to produce evidence regarding the termination, but Vickers refused and informed plaintiff that he could not return to defendant's premises.

(Compl., DE # 1-1, ¶ 25.) Since defendant's termination of the Distribution Agreement, defendant has been operating the distribution route in plaintiff's name at a loss. (Id. ¶¶ 33-34.)

On 8 January 2014, plaintiff filed the instant complaint in state court, asserting claims for breach of contract, fraud, and unfair and deceptive trade practices under Chapter 75 of the North Carolina General Statutes. Plaintiff seeks injunctive and compensatory relief, including punitive damages. On 9 January 2014, before the state court could hear plaintiff's application for a temporary restraining order, (Pl.'s Mem., DE # 11, at 5), defendant removed the action to this court.

On 5 February 2014, plaintiff filed the motion for preliminary injunction along with a supporting memorandum and affidavits. On 24 February 2014, plaintiff filed two additional supporting affidavits and the motion for hearing. On 26 February 2014, defendant filed its memorandum in opposition to the motion for preliminary injunction and supporting declarations. On 4 March 2014, plaintiff filed a counter-affidavit. On 6 March 2014, defendant filed the motion to strike the two affidavits plaintiff filed on 24 February 2014. On 14 March 2014, plaintiff filed a response in opposition to the motion to strike. On the same day, defendant filed the motion for leave to file a corrected declaration. On 20 March 2014, defendant filed a response in opposition to plaintiff's motion for hearing, to which plaintiff filed a reply on 3 April 2014. Plaintiff did not file a response to defendant's motion for leave to file a corrected declaration, and for good cause shown, the court will allow that motion.[1]

## II. DISCUSSION

---

[1] Also pending before the court is defendant's motion to dismiss plaintiff's fraud and unfair and deceptive trade practices claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (DE # 14.) The disposition of that motion has no direct impact on the court's resolution of the other pending motions and thus will be set forth in separate order.

3

A.  Motion for Preliminary Injunction

Plaintiff requests that the court preliminarily enjoin defendant "from in any way interfering with Plaintiff['s] . . . operation of his bakery products distribution route . . . and from taking any action or invoking any timeline to force the sale of Plaintiff['s] . . . independent operator's agreement." (Mot., DE # 9, at 1.) "Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." Direx Int'l, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1991) (internal quotation marks and citations omitted) (alteration in original). "To obtain a preliminary injunction, a moving party must establish the presence of the following: (1) 'a clear showing that it will likely succeed on the merits'; (2) 'a clear showing that it is likely to be irreparably harmed absent preliminary relief'; (3) the balance of equities tips in favor of the moving party; and (4) a preliminary injunction is in the public interest." United States v. South Carolina, 720 F.3d 518, 533 (4th Cir. 2013) (citation omitted). Each of these requirements must be satisfied. The Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 347 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010).

Plaintiff seeks a preliminary injunction only in regards to his breach of contract claim. Therefore, the court considers plaintiff's likelihood of success on the merits only as to plaintiff's claim that defendant breached the Distribution Agreement. To establish a breach of contract claim under North Carolina or Pennsylvania law,[2] a plaintiff must show (1) the existence of a

---

[2]The parties have not addressed which state's law governs plaintiff's breach of contract claim. The Distribution Agreement provides that "[t]he validity, interpretation and performance of this Agreement shall be controlled by and construed in accordance with the laws of the State of Pennsylvania." (Compl., Ex. 1, DE # 1-1, §
(continued...)

4

valid contract and (2) breach of its terms or a duty imposed by it.[3]  See Sewer Auth. of Scranton v. Pa. Infrastructure Inv. Auth. of Commonwealth, 81 A.3d 1031, 1042 (Pa. Commw. Ct. 2013); Ahmadi v. Triangle Rent A Car, Inc., 691 S.E.2d 101, 103 (N.C. Ct. App. 2010).  Neither party disputes the validity of the Distribution Agreement.  Rather, their dispute centers on whether defendant breached that Agreement in its termination of the Agreement.  Defendant may terminate the Agreement in the event of the distributor's "non-curable" or "chronic" breach.  The pertinent provisions of the Distribution Agreement provide as follows.

> §8.2 NON-CURABLE BREACH: If the breach by DISTRIBUTOR involves criminal activity or fraud, threatens public health or safety, or threatens to do significant harm to GWBD,[4] its affiliates, it operations, its trademarks or commercial reputation, GWBD may terminate this Agreement immediately upon written notice and DISTRIBUTOR shall have no right to cure.
>
> §8.3 CURABLE BREACH: In the event of breach by DISTRIBUTOR other than under §8.2, GWBD shall give DISTRIBUTOR three (3) business days written notice within which DISTRIBUTOR may cure the breach. If DISTRIBUTOR fails to cure such breach within said three (3) day period, GWBD may thereafter terminate this Agreement and DISTRIBUTOR shall have no further right to cure; provided, further, that the parties agree that repeated violations constitute a chronic breach and threaten significant harm to GWBD, its operations, its trademarks or commercial reputation, and in such event GWBD shall be entitled to terminate this Agreement pursuant to §8.2 and DISTRIBUTOR shall have no further right to cure.

(Compl., Ex. 1, DE # 1-1.)

---

[2](...continued)
11.8.)

[3]Under Pennsylvania law, damages is also an element of a breach of contract claim.  See Sewer Auth. of Scranton v. Pa. Infrastructure Inv. Auth. of Commonwealth, 81 A.3d 1031, 1042 (Pa. Commw. Ct. 2013).

[4]Defendant was formally known as George Weston Bakeries Distribution, Inc. or "GWBD."  (Compl., DE # 1-1, ¶ 2.)

Plaintiff contends that defendant's stated reasons for terminating the Distribution Agreement, i.e., "flushing" product and committing a chronic breach, are pretext for retaliating against him for his role in opposing defendant's reduction of margins paid to independent operators. (Compl., DE # 1-1, ¶¶ 27-28; Pl.'s Mem., DE # 11, at 4, 6.) In support of this theory, plaintiff testifies that when he purchased his route, defendant's employee, Sean Browning, trained him "on the proper handling, distribution and invoicing of bakery goods purchased and delivered to customers." (Pl. Aff., DE # 12, at 1.) Plaintiff states further,

> During this training, I was informed that any shrinkage in product that occurred between the time I purchased the product from the Defendant and the time the product was sold by the customer is a liability that I incur. The loss of product before it is sold by the customer, whether it is through theft by actual grocery store employees or by grocery store customers, is known as shrinkage. I was trained that in order to prevent shrinkage, I was allowed to sell the products to the grocery store, but I could keep the products on my delivery truck until the customer was in need of those products. Essentially, I was acting as a warehouse for the grocery store. If the customer ended up not needing those products or another store was in need, I was allowed to buy those products back from the grocery store where the products had been sold and distribute them to other customers. This is a very common practice among delivery personnel.

(Id. at 1-2.) Defendant issued him a handheld computer device which can be used to account for this buying back and resale of product. (Id. at 2.) Plaintiff was never informed that this practice was known as "flushing" product nor that it constitutes a breach of the Distribution Agreement, and he obtains no financial advantage from engaging in the practice. (Id.) Plaintiff submits affidavits of other local independent operators to corroborate his testimony. (See, e.g., Hedden Aff., DE # 9-3.)

As to defendant's additional reason for terminating the Distribution Agreement,

6

plaintiff's chronic breach, plaintiff states that contrary to the termination letter, in the nine months prior, he had received three, rather than four, letters notifying him that he was in violation of the Distribution Agreement. (Pl. Aff., DE # 12, at 3.) He also submits affidavits from other local independent operators who received more notices of violations during shorter time periods whose distribution agreements defendant did not terminate for a chronic breach. (See Hedden Second Aff., DE # 9-4; Nguyen Second Aff., DE # 9-11.)

On the other hand, defendant has come forward with contrary evidence. Browning, an employee of defendant's parent company, acknowledges that he conducted plaintiff's orientation in 2006 when plaintiff purchased his distribution route. (Browning Decl., DE # 21, ¶¶ 2-3.) As part of the orientation to independent operators, Browning reviews the function of "buying back" product from one customer to sell to another customer, which is executed on the independent operator's handheld computer device. (Id. ¶ 4.) However, Browning testifies that

> I have never instructed anyone to generate false invoices and use the buy back function to avoid being charged for their truck stock at the end of the day on Saturday. That is not a legitimate use of the buy back function. I have heard this practice referred to as "flushing" inventory, and it is strictly prohibited by BFBD. While I have heard the term "flushing," it is not a common term because [independent operators] are not regularly engaged in this prohibited practice.

(Id. ¶ 7 (emphasis in original).)

Brant Vickers, defendant's representative who terminated the Distribution Agreement, further explains that defendant does not prohibit independent operators from buying back product from one customer to sell to another customer. (Vickers Decl., DE # 30-1, ¶ 15.) He claims that is not what plaintiff was doing. (Id.) According to Vickers, plaintiff was in fact "flushing" product. (See id. ¶¶ 19-24.) Vickers describes this practice and how defendant

7

addressed it as follows.

> Several years ago, BFBD became aware of [independent operators] returning and seeking credit for fresh product (or "truck stock") by creating and transmitting to BFBD false invoices for the extra product they had at the end of the week, then creating and transmitting false buyback invoices for the exact same amount of product that was allegedly sold. BFBD refers to these false invoices as "zero dollar tickets," and refers to this practice of obtaining buyback credit for extra fresh product to which the [independent operator] is not entitled as "flushing" product.
> []On June 1, 2009, BFBD instituted a specific written policy against the false generation of zero dollar tickets, which states, "we consider fake invoices and credit tickets to be the creation of false documents and falsification of business records which may be grounds for termination of your Distribution Agreement." This policy is posted in the Raleigh distribution center where [plaintiff] picked up his product every day. . . . It is also BFBD's practice to provide a copy of such policies to [independent operators] directly by placing a copy of the policy in each [independent operator]'s "box" in the distribution center or depot.

(Id. ¶¶ 16-17.) With respect to plaintiff's conduct, according to defendant, he (plaintiff) benefitted "because he did not have to carry the expense of his unsold inventory at the end of the week." (Id. ¶ 25.) Defendant bore that expense and could not recoup it as the product was not placed in a grocery store to be sold, and defendant also bore the risk that the product might go stale before it could be sold. (Id.) Finally, Vickers points to other independent operators' distribution agreements which have been terminated for engaging in "flushing" product and committing a chronic breach. (See id. ¶ 26 & Ex. I, DE # 24-10.)

Plaintiff, in turn, disagrees with defendant's characterization of his conduct, (see Pl. Counter-Aff., DE # 26, at 1-3), and continues to maintain that he never benefitted financially from the method he employed for returning fresh product, (id. at 3-4). He states that he never received or saw the document setting forth defendant's policy against "flushing" product. (Id. at

8

3.)

As the foregoing summation of the evidence shows, the factual disputes regarding whether defendant properly terminated the Distribution Agreement are legion. As such, the court concludes that plaintiff has not clearly shown that he will likely succeed on the merits of his breach of contract claim. See Wellin v. Wellin, No. 2:13-cv-1831-DCN, 2013 WL 6175829, at *4 (D.S.C. Nov. 22, 2013) (recognizing "a number of courts have declined to issue a preliminary injunction when there are significant factual disputes" and finding the plaintiff had not clearly shown likelihood of success on the merits on breach of fiduciary duty and securities claims based on "significant factual disputes impossible to resolve" at the time); Torres Advanced Enter. Solutions LLC v. Mid-Atl. Prof'ls Inc., No. PWG-12-3679, 2013 WL 531215, at *3 (D. Md. Feb. 8, 2013) ("Relevant to the present case is that post-*Real Truth* courts have 'declined to issue a preliminary injunction when there are significant factual disputes' in breach of contract cases." (citation omitted)); Chattery Int'l, Inc. v. Jolida, Inc., Civil No. WDQ-10-2236, 2011 WL 1230822, at *9, 11 (D. Md. Mar. 28, 2011) (concluding that based, in part, on the existence of factual questions, plaintiff had not clearly shown likelihood of success on its trademark infringement claim).

Even if plaintiff could make such a showing, the court also concludes that plaintiff has failed to clearly show that he will likely be irreparably harmed unless a preliminary injunction issues. "Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate. Thus, when the record indicates that [plaintiff's loss] is a matter of simple mathematic calculation, a plaintiff fails to establish irreparable injury for preliminary injunction purposes." Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating

9

Co., 22 F.3d 546, 551-52 (4th Cir. 1994) (internal quotation marks and citations omitted) (alteration in original); see also Bethesda Softworks, LLC v. Interplay Entm't Corp., 452 F. App'x 351, 353 (4th Cir. 2011).

Plaintiff argues that his damages are incalculable based on the harm to his reputation and goodwill. (Pl. Mem., DE # 11, at 10-11.) Specifically, he points out that he has built up his route and has a stake in maintaining his customer relationships, which the persons now operating the route do not. (Id.) He questions how his damages might be calculated with any accuracy if a sale of the route (which is permitted upon termination of the Distribution Agreement) is forced. (Id. at 11.) While there is authority for the general proposition that loss of goodwill may satisfy the irreparable harm requirement, see Multi-Channel, 22 F.3d at 552 ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied."), a court still must look at the specific facts of each case to determine whether the harm to goodwill makes damages difficult to ascertain, see MicroAire Surgical Instruments, Inc. v. Arthrex, Inc., 726 F. Supp. 2d 604, 637 (W.D. Va. 2010) ("Although the authorities upon which [the plaintiff] relies, namely the Fourth Circuit decision in *Multi–Channel*, contain broad language regarding the availability of injunctive relief when the loss of future customers or harm to goodwill renders the calculation of damages difficult, they do not hold [ ] that injunctive relief is automatic and required in such circumstances, and they proceed[ ] to analyze the specific facts of the case before determining that the loss of future customers or the harm to goodwill makes damages difficult to ascertain." (most alterations in original) (citation omitted)). Depending on the facts, goodwill can often be valued in monetary terms. Compare Dexter 345 Inc. v. Cuomo, 663 F.3d 59, 63 (2d Cir. 2011)

10

(affirming the district court's denial of a preliminary injunction on the ground that the appellants had failed to make the requisite showing of irreparable harm and stating "[t]he district court correctly found that any loss of goodwill would result from the Appellants' inability to continue operating their budget hotel business as they had in the past[, and] [t]he long history of operation . . . ensures that they will be able to calculate money damages for any loss of goodwill"); Spacemax Int'l LLC v. Core Health & Fitness, LLC, Civil Action No. 2:13-4015-CCC-JAD, 2013 WL 5817168, at *2 (D.N.J. Oct. 28, 2013) (where the plaintiff claimed the defendant had breached the exclusive distributorship agreement in terminating it and by entering into a new agreement with another party and where the plaintiff argued it would lose market share and potentially its entire business without a preliminary injunction, finding the plaintiff had not sufficiently demonstrated irreparable harm given the plaintiff's decade-long history of selling the subject equipment as "any loss in sales or harm to reputation can be given a monetary value by looking at sales records, profits, and financial analysis of what Plaintiff contends is a small, limited market"); Torres, 2013 WL 531215, at *5 (where the plaintiff argued loss of goodwill constituted irreparable harm as a result of the defendant's termination of a portion of a subcontract, taking judicial notice of the Financial Accounting Standards Board's "voluminous standard for dealing with goodwill in order to calculate its value on a balance sheet" and concluding "[t]his ability to calculate money damages from the impairment of goodwill demonstrates an adequate remedy at law"); Walter v. CPC Int'l Inc., 22 Phila. C. 240, 253-59 (Pa. Com. Pl. 1991) (dissolving preliminary injunction because the plaintiffs demonstrated that their losses could be compensated in money damages by evidence of resale value of bakery product distribution route, loss of profits, and goodwill), aff'd, 610 A.2d 73 (Pa. Super. Ct. 1992)

(table), with Blackwelder Furniture Co. of Statesville v. Seilig Mfg. Co., Inc., 550 F.2d 189, 196-97 (4th Cir. 1977) (reversing denial of a preliminary injunction where the defendant manufacturer had terminated the plaintiff's furniture line dealership because the harm posed to the plaintiff's goodwill was incalculable inasmuch as the plaintiff would be unable to fill customer orders and then gain a reputation for unreliability and it would impact the plaintiff's efforts to be known as a "'full-line' furniture discounter"); Fairfield Resorts, Inc. v. Fairfield Mountains Prop. Owners Ass'n, Inc., No. 1:06CV191, 2006 WL 2524188, at *4 (W.D.N.C. Aug. 29, 2006) (recognizing customer confusion resulting from the defendant's changing of the signage at a resort to a completely different name as "irreparable harm in the form of losses of goodwill, reputation and future business"); Fairfield Resorts, Inc. v. Fairfield Mountains Prop. Owners Ass'n, Inc., No. 1:06CV191, 2006 WL 1889152, at *4-5 (W.D.N.C. July 7, 2006) (finding that if the defendant property owner were not enjoined from evicting the plaintiff real estate management company, the plaintiff faced a present threat of irreparable harm in "the loss of customers, loss of good will, damage to its business reputation, and significant interference with the possession and enjoyment of certain real property").

     Here, plaintiff had been operating the distribution route for more than seven years when defendant terminated it. Based on the fact that plaintiff's distribution route was well established at the time of termination, there should be more than sufficient historical data from which to calculate monetary damages. Additionally, any goodwill plaintiff has built up in the distribution route is included in the valuation of the route, as evidenced by plaintiff's own testimony that he has created equity in the route and its value has increased from $108,000 to $140,000. There is a monetary value that can be placed on the loss of goodwill. Defendant has come forward with

12

evidence that there is an active market for the sale of rights to distribute defendant's products in North Carolina, (Pokallus Decl., DE # 22, ¶ 4), and that the fair market value of any such distributorship is based on a formula of the weekly average of net product sales revenue times a multiple, (Barnes Decl., DE # 20, ¶ 16). Because plaintiff's breach of contract damages are calculable, he has not clearly shown that he is likely to be irreparably harmed absent preliminary relief. But see Williams v. Bimbo Foods Bakeries Distrib., Inc., Civil Action No. 3:10-CV-167-DCK, 2010 WL 1994847, at *5 (W.D.N.C. May 18, 2010) ("If BFBD is permitted to terminate[] Williams' Distribution Agreement and force him to sell his distribution rights, or sell them for him after ninety days, . . . Williams is likely to suffer irreparable harm. . . . [I]t would be difficult, if not impossible for Williams to articulate and set forth with any specificity, the damages he would sustain were BFBD permitted to force a sale or sell the route for him. . . . If the Court were not to enter this Preliminary Injunction and the route were taken from Williams and sold, Williams would lose his livelihood."); Waldron v. George Weston Bakeries, Inc., 575 F. Supp. 2d 271, 278 (D. Me. 2008) ("[I]it is clear that Plaintiffs' absence and the operation of Plaintiffs' routes by substitutes will continue to impact the good will each of them establish through regular weekly contact with their customers. It will be very difficult, if not impossible, for the Court to determine how and if that good will would have increased sales during the period that GWBD was operating Plaintiffs' routes. Under these circumstances, a finding of irreparable harm is warranted." (citations omitted)); aff'd, 570 F.3d 5 (1st Cir. 2009).

With plaintiff failing to make the required showing of irreparable harm, the balance of equities necessarily does not tip in his favor. See Z–Man Fishing Prods., Inc. v. Renosky, 790 F. Supp. 2d 418, 434 (D.S.C. 2011) ("Here, the Court has found that Plaintiffs failed to show they

13

will suffer irreparable harm in the absence of a preliminary injunction; therefore, the balance of equities does not favor Plaintiffs."). Finally, the court recognizes that the public interest is served by the enforcement of valid contractual obligations. Williams, 2010 WL 1994847, at *5. Nonetheless, in this case, given the factual dispute over the termination of the Distribution Agreement, that interest is furthered no matter whether the court grants or denies preliminary injunctive relief.

In sum, plaintiff has not made the requisite showing to justify entry of a preliminary injunction.

B.      Motion for Hearing

Plaintiff requests a hearing on his motion for preliminary injunction and that any such hearing be consolidated with a hearing on the motion for preliminary injunction in Ramsey v. Bimbo Foods Bakeries Distribution, Inc., No. 5:14-CV-26-BR (E.D.N.C.). Defendant opposes that request.

The motion for preliminary injunction has been thoroughly briefed, and numerous affidavits/declarations and supporting documents have been submitted. Plaintiff does not suggest that a hearing on his motion for preliminary injunction is mandatory. (See Reply, DE # 36, at 3 ("A hearing is in the full discretion of the Court . . . .").) See also Blackwelder, 550 F.2d at 192 n.1 ("[F]inding facts from conflicting affidavits [submitted regarding a motion for preliminary injunction] is not always possible and . . . a perplexed district judge *may in his discretion* require live testimony 'where everything turns on what happened and that is in sharp dispute.'" (citation omitted) (emphasis added)). As noted previously, factual disputes do exist as to the termination of the Distribution Agreement, which is relevant to plaintiff's likelihood of

14

success.  However, even assuming the court should resolve those factual disputes by way of a hearing, such hearing would not ultimately serve any purpose as the court has also concluded that plaintiff failed to clearly show irreparable harm– a conclusion which did not require the court to resolve any factual dispute.  Accordingly, the motion for hearing will be denied.

      C.      Motion to Strike

Finally, defendant has moved to strike the two affidavits of Michael Zipperian (DE ## 16, 17), that plaintiff filed on 24 February 2014, on the ground that they are untimely, being that plaintiff filed his motion for preliminary injunction along with other supporting affidavits and documents on 5 February 2014.  Plaintiff acknowledges the untimeliness of the filing of the affidavits, yet argues that good cause and excusable neglect exist to warrant the court's consideration of the affidavits.  "While Federal Rule of Civil Procedure 6(c)(2) does require any supporting affidavits to be served with a motion, the Court has discretion to consider affidavits that were not filed with the accompanying motions in preliminary injunction hearings." Superior Performers, Inc. v. Meaike, No. 1:13CV1149, 2014 WL 1412434, at *3 (M.D.N.C. Apr. 11, 2014) (citation omitted).  Because the testimony in the two affidavits is cumulative of the testimony in the timely filed affidavits, defendant suffers no prejudice in the court's consideration of the two affidavits, and therefore, the court will deny defendant's motion.

15

### III. CONCLUSION

For the foregoing reasons, plaintiff's motions for a preliminary injunction and a hearing are DENIED, and his motion for leave to file is ALLOWED. Defendant's motion to strike is DENIED.

This 30 May 2014.

                                           W. Earl Britt
                                           Senior U.S. District Judge