IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO. 5:14-CV-17-BR

| | | |
|---|---|---|
| JOHN T. MARTIN, | | |
| Plaintiff, | | |
| v. | | |
| BIMBO FOODS BAKERIES DISTRIBUTION, INC.; f/k/a GEORGE WESTON BAKERIES DISTRIBUTION, INC., | | ORDER |
| Defendant. | | |

This matter comes before the court on defendant Bimbo Foods Bakeries Distribution, Inc., f/k/a George Weston Bakeries Distribution, Inc.'s ("defendant" or "BFBD") motion for summary judgment. (DE # 46.) Plaintiff John T. Martin ("plaintiff" or "Martin") filed a response, (DE # 49), to which defendant replied, (DE # 50). This matter is ripe for disposition.

## I. BACKGROUND

In 2006, for $108,000, Martin, as an "independent operator," purchased a distribution route which granted him exclusive rights to purchase bakery products from BFBD and sell those products to grocery store chains and independent grocers in a designated area. (Compl., DE # 1-1, ¶¶ 6, 8.)[1] Around the same time, the parties entered into a Distribution Agreement ("Agreement") which governed their relationship. (Id. ¶ 5 & Ex. 1.)

As an independent operator ("IO"), Martin's income was based on the difference — referred to as the "margin" or "spread" — between the price at which he purchased and sold

---

[1] Plaintiff's complaint is verified. Therefore, it may be considered in resolving defendant's motion for summary judgment. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) ("[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." (citations omitted)).

BFBD's bakery products. (Id. ¶ 8; Vickers Decl., DE # 24, ¶ 9.) In June of 2013, BFBD informed Martin and other local IOs that it was increasing the price at which it sold them certain products, which had the effect of decreasing the margins that IOs earned on the resale of those products. (Compl., DE # 1-1, ¶ 10; Barnes Decl., DE # 20, ¶¶ 10, 14.) Martin and most of the other IOs "united in an effort to fight the Defendant's effort to unilaterally reduce margins." (Compl., DE # 1-1, ¶ 12.) A committee of six IOs was formed to communicate and negotiate with BFBD about the reduced margins. (Id.) Martin was one of the committee members and took an active role in the committee. (Id. ¶¶ 12, 18; Def.'s Mem., DE # 47, at 5 (defendant stating, "It is undisputed that Plaintiff vocally disagreed with [the] change in pricing.")). Various forms of communication between the committee, its counsel, representatives of BFBD, and defense counsel occurred. (Compl., DE # 1-1, ¶¶ 14-16.) The negotiations failed to produce the result that Martin and the other IOs sought. (Id. ¶ 15.)

In the meantime, Martin continued to operate his distribution route. (Id. ¶ 20.) On 21 December 2013, Brant Vickers, BFBD's sales representative, delivered to Martin a document entitled "Notice of Termination of Distribution Agreement." (Id. ¶ 24 & Ex. 5.) In that document, BFBD informed Martin that it recently discovered that he had "engaged in a practice of 'flushing' product by creating false sales and 'buyback' invoices," for which he received approximately $2,500 to which he was not entitled. (Id., Ex. 5.) According to the document, such fraudulent conduct constitutes a "material and noncurable breach" of the Agreement. (Id.) The document also refers to other "material violations" of the Agreement, which constitute a "chronic breach" of the Agreement. (Id.) BFBD terminated the Agreement effective immediately. (Id.)

On 8 January 2014, Martin filed the instant complaint in state court, asserting claims for breach of contract, fraud, and unfair and deceptive trade practices under Chapter 75 of the North Carolina General Statutes. Martin sought injunctive and compensatory relief, including punitive damages. On 9 January 2014, BFBD removed the action to this court. (DE # 1.) On 30 May 2014, the court denied Martin's motion for a preliminary injunction. (DE # 40.) Subsequently, the court granted in part BFBD's Rule 12(b)(6) motion, dismissing Martin's fraud claim. (DE # 41.) Now, BFBD moves for summary judgment on Martin's two remaining claims: breach of contract and unfair and deceptive trade practices.

## II. LEGAL STANDARD

Summary judgment is proper only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must ask "'whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict . . . .'" Maryland Highways Contractors Ass'n, Inc. V. Maryland, 933 F.2d 1246, 1252 (4th Cir. 1991) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)). Summary judgment should be granted only in those cases "in which it is perfectly clear that no genuine issue of material fact remains unresolved and inquiry into the facts is unnecessary to clarify the application of the law." Haavistola v. Cmty. Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir. 1993). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

In considering a motion for summary judgment, the court is required to draw all reasonable inferences in favor of the non-moving party and to view the facts in the light most

favorable to the non-moving party. Id. at 255. The moving party has the burden to show an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The party opposing summary judgment must then demonstrate that a triable issue of fact exists; he may not rest upon mere allegations or denials. Anderson, 477 U.S. at 248.

## III. DISCUSSION

### A. Breach of contract

Under Pennsylvania law, a breach of contract claim has three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."[2] CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). In its motion, BFBD only challenges the second element, arguing that there is no genuine dispute of material fact that it did not breach a duty imposed by the Agreement. It maintains that Martin's fraudulent activity was "the sole reason for the termination of Plaintiff's Distribution Agreement." (Def.'s Mem., DE # 47, at 2.) In response, Martin contends that BFBD breached the Agreement by terminating it in retaliation for his vocal participation in the group which opposed BFBD's June 2013 price increases and argues that defendant's stated reason is pretextual. (Pl.'s Resp., DE # 49, at 9.)[3]

The Agreement permitted BFBD to terminate it in the event that Martin committed a breach of the Agreement in a fraudulent manner. Section 8.2 of the Agreement states: "**<u>NON-</u>**

---

[2] The parties included a choice of law provision in the Agreement which states, "The validity, interpretation and performance of this Agreement shall be controlled by and construed in accordance with the laws of the Commonwealth of Pennsylvania." (Compl., DE # 1-1, Ex. 1, § 11.8.) Accordingly, plaintiff's breach of contract claim is governed by Pennsylvania law. See Tanglewood Land Co. v. Byrd, 261 S.E.2d 655, 656 (N.C. 1980) (noting that the North Carolina Supreme Court "has held that where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect.").

[3] Martin also contends that BFBD breached the Agreement by seizing and operating his route. (Compl., DE # 1-1, ¶ 51(3).) BFBD seeks dismissal of this claim, arguing that the Agreement permitted it to operate Martin's route upon termination of the Agreement. (Def.'s Mem., DE # 47, at 20.) This claim is not independent of Martin's claim that BFBD improperly terminated the Agreement. Whether BFBD had the right to operate Martin's route is dependent upon whether it permissibly terminated the Agreement. Thus, these two claims rise and fall together.

4

**CURABLE BREACH**: If the breach by DISTRIBUTOR involves . . . fraud, . . . [BFBD] may terminate this Agreement immediately upon written notice and DISTRIBUTOR shall have no right to cure." (Compl., DE # 1-1, Ex. 1 (emphasis in original).)

BFBD presents evidence suggesting that Martin engaged in a fraudulent practice known as "flushing," which occurs in two steps. First, the IO submits a false invoice to BFBD to create the impression that product which in fact remains on the IO's truck was delivered and placed in a store for sale to consumers. (Vickers Decl., DE # 24, ¶ 16.) Second, usually on the Monday of the following week, the IO creates a false buyback invoice for the exact amount of product that he allegedly sold. (Id. ¶¶ 16, 19.)[4] The IO can then sell that inventory to another store if it is still fresh or return it to BFBD for full credit if it is stale. (Id. ¶ 14; Browning Decl., DE # 21, ¶ 5.) At the end of each week, BFBD "settles up" with the IO and gives credit for deliveries made and for returned products that did not sell by the "stale" date. (Vickers Decl., DE # 24, ¶ 13; Vickers Decl., DE # 48, ¶ 8.) However, BFBD charges the IO for any unsold fresh inventory remaining on the IO's truck at the end of the week. (Vickers Decl., DE # 24, ¶ 14; Browning Decl., DE # 21, ¶ 7.) Thus, "flushing" results in BFBD crediting the IO for deliveries that were never made instead of charging the IO for fresh product that remained on the truck.[5] (Vickers Decl., DE # 24, ¶ 25.) This practice also creates the risk that BFBD will refund the IO for a returned stale product that was never offered for sale to consumers. (Id.; Vickers Decl., DE # 48, ¶ 16.)

On 7 December 2013, Martin generated a sales invoice and received credit for certain products allegedly delivered to Food Lion # 1374. (Vickers Decl., DE # 24, ¶ 20 & Ex. F.)

_____

[4] BFBD permits IOs to "buy[] back fresh product from one customer to sell to another customer that has a need for that product." (Vickers Decl., DE # 24, ¶ 15.)

[5] The grocery stores at issue in this case — known as "SBT customers" — do not pay for a delivered product until it is bought by a consumer. However, BFBD purchases the "receivable" from the IO and credits the IO's "settlement account" after delivery is made. (Vickers Decl., DE # 48, ¶ 9.)

Martin admits that he never actually placed the products at issue in that Food Lion. (Martin Dep., DE # 50-1, at 80:17-19; 81:3-4; 90:23-91:4.) Instead, he testifies that he told his 17-year-old son to deliver the products to another Food Lion, but concedes that he does not know if his son ever did so. (Id. at 79:19-25; 97:9-98:2.) BFBD presents evidence showing that at least some of the inventory in question was never placed in another store. (Vickers Decl., DE # 48, ¶ 17 & Ex. A.) It argues that there is no question of material fact that it terminated the Agreement based on this fraudulent activity. (Def.'s Mem., DE # 47, at 19.) As further support for this contention, BFBD notes that it has a "written policy that has been posted conspicuously in the Raleigh Depot since 2009" which prohibits the practice of "flushing" product. (Id. at 17; Stanton Dep., DE # 50-5, at 39:3-21; Vickers Decl., DE # 24, ¶ 17 & Ex. D.) Additionally, BFBD establishes that it "has terminated at least three other Distribution Agreements in North Carolina for the exact same practice of which Plaintiff is accused." (Def.'s Mem., DE # 47, at 18; Vickers Decl., DE # 24, ¶ 26 & Ex. I.)

Martin argues that there is a genuine dispute as to whether BFBD's given reason was the actual reason for the termination of the Agreement. (Pl.'s Resp., DE # 49, at 9.) In support of his claim that BFBD terminated the Agreement in retaliation for his opposition to the price increases, Martin presents two principal pieces of evidence. First, he points to the timing of the termination. Martin notes that the Agreement was terminated "just weeks after a meeting at which [he] fought the Defendant over its unilateral reduction in profit margins." (Id. at 12.) Martin testified that the meetings regarding the pricing changes ended around the beginning of November [2013] and that the Agreement was terminated on 21 December 2013. (Martin Dep., DE # 49-4, at 223:11-22; Compl., DE # 1-1, Ex. 5.) Second, he notes that on 11 December 2013,

BFBD terminated the Agreement of Richard Ramsey, who served on the same committee opposing the price increases. (Compl., DE # 1-1, ¶ 29 & Ex. 6.)

Despite BFBD's argument to the contrary, Martin's evidence amounts to more than pure speculation that BFBD's given reason for terminating the Agreement was pretextual. While alone the timing may not create a genuine dispute for trial, when coupled with the evidence of the termination of Ramsey's Agreement, a reasonable juror could find that BFBD terminated the Agreement in retaliation for Martin's opposition to the BFBD price increases. Cf. Hodak v. Madison Capital Mgmt., LLC, 348 F. App'x 83, 91 (6th Cir. 2009) (denying summary judgment where, even assuming plaintiff-employee breached a confidentiality agreement, a triable question existed as to whether the breach was the actual reason for plaintiff's termination); Clay v. Pa. Coal Co., LLC, 955 F. Supp. 2d 588, 597-98 (N.D. W. Va. 2013) (applying Pennsylvania law and denying motion to dismiss where defendants' valid "for-cause" reason for terminating plaintiff's employment contract may not have been the actual reason). At the summary judgment stage, the court will not weigh the competing evidence to determine the actual reason behind the termination. Accordingly, it will deny summary judgment as to Martin's breach of contract claim.[6]

### B. Unfair and deceptive trade practices

For Martin to prevail on his North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") claim, he must prove that "(1) defendant committed an unfair or deceptive act or

---

[6] In his brief, Martin argues that BFBD breached the implied covenant of good faith and fair dealing. (Pl.'s Resp., DE # 49, at 10-11.) To the extent Martin relies on this theory to support his breach of contract claim, the court will not consider it. The court recognizes that under Pennsylvania law, Martin was not required to plead the breach of good faith as a separate cause of action. See CRS Auto Parts, Inc. v. Nat'l Grange Mut. Ins. Co., 645 F. Supp. 2d 354, 369 (E.D. Pa. 2009) ("[A] claim for breach of a covenant of good faith and fair dealing may not be maintained as an independent cause of action separate from the breach of contract claim."). However, Martin impermissibly sets out this theory in support of his breach of contract claim for the first time in response to BFBD's summary judgment motion. See Samosky v. United Parcel Serv., 944 F. Supp. 2d 479, 505 (S.D. W. Va. 2013) ("It is well-settled that a plaintiff may not expand its claims to assert new theories in response to summary judgment or on appeal.") (internal quotation omitted).

practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff." Ellis v. Louisiana-Pac. Corp., 699 F.3d 778, 787 (4th Cir. 2012) (internal quotation omitted). Whether an act rises to the level of unfair or deceptive is a question of law for the court to determine. See, e.g., Tucker v. Boulevard at Piper Glen LLC, 564 S.E.2d 248, 250 (N.C. Ct. App. 2002). For an act to fall under the statute's purview, it "must be immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Kelly, 671 F. Supp. 2d at 798-99. It is well-settled that a simple breach of contract claim does not amount to an unfair or deceptive act under the statute, "absent substantial aggravating circumstances." See, e.g., Gilbane Bldg. Co. v. Fed. Reserve Bank of Richmond, Charlotte Branch, 80 F.3d 895, 903 (4th Cir. 1996) (internal quotation omitted). Aggravating factors may be found "in the circumstances" of the breach of the contract. Bartolomeo v. S.B. Thomas, Inc., 889 F.2d 530, 535 (4th Cir. 1989).

Martin's UDTPA claim is based on the alleged retaliatory termination of the Agreement. (Pl.'s Resp., DE # 49, at 17.) He contends that the termination was used to punish him and to send a message to other IOs that any opposition to defendant's price increases would be met with termination of the distribution agreement. (Compl., DE # 1-1, ¶ 45.) BFBD argues that because there is no question that it terminated the Agreement based on Martin's fraud, his UDTPA claim may be properly disposed of on summary judgment. (Def.'s Mem., DE # 47, at 22-23.) Alternatively, it argues that even if plaintiff's breach of contract claim survives, "there is absolutely no evidence of[] any actions by BFBD that would rise to the level of a "substantially aggravating circumstances [sic]." (Id. at 23.)

In its order granting in part BFBD's motion to dismiss, the court found that the alleged pretextual termination of the Agreement "may constitute a substantially aggravating

circumstance attendant to the breach of contract." (DE # 41, at 7.) Above, the court concluded that a genuine dispute exists as to whether BFBD terminated the Agreement in retaliation for Martin's participation in the committee which opposed BFBD's price increases. This dispute is also central to Martin's UDTPA claim, as it is determinative of whether substantially aggravating circumstances attended the alleged breach of contract. Thus, summary judgment in favor of BFBD on Martin's UDTPA claim is improper.

## IV. CONCLUSION

Based on the foregoing, defendant's motion for summary judgment, (DE # 46), is DENIED.

This 23 April 2015.

_____

W. Earl Britt

Senior U.S. District Judge